UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-cv-22055-ALTMAN/Reid

**PROFESSIONAL CONSULTING
SERVICES S.A.S.**, *et al.*,

    *Plaintiffs*,

v.

**INMIGRACION PRO, LLC,** *et al.*,

    *Defendants*.

_____/

## ORDER GRANTING THE DEFENDANTS' MOTION TO COMPEL ARBITRATION

Our Defendants—Inmigracion Pro, LLC ("IPRO"), and its Chief Operating Officer, Edgar Quiroga—move to "compel arbitration in Neiva-Huila, Colombia[.]" Motion to Compel Arbitration and Stay Proceedings (the "Motion") [ECF No. 40] at 1.[1] In the alternative, they ask that we *either* "dismiss the amended complaint pursuant to the doctrine of forum non-conveniens" *or* "dismiss the amended complaint pursuant to Rule 12(b)(6) for various legal pleading infirmities." *Ibid*. After careful review, we **GRANT** the Motion, **STAY** these proceedings, and **ORDER** the parties to submit to arbitration before the appropriate tribunal in Colombia.

### THE FACTS

One of our Plaintiffs, Inmigracion al Dia ("IAD"), is a South Carolina law firm "specializing in providing immigration advice and services to the Spanish-speaking community." Amended Complaint [ECF No. 33] ¶ 2. Our second Plaintiff is Professional Consulting Services S.A.S. ("PCS"), a Colombia-based consulting firm that "provides marketing services, client leads, and administrative

---

[1] The Motion is ripe for adjudication. *See* Response in Opposition to Defendants' Motion to Compel Arbitration and Stay Proceedings ("Response") [ECF No. 44]; Reply in Support of Motion to Compel Arbitration ("Reply") [ECF No. 46].

support to attorneys." *Id.* ¶ 17. IAD is, to this day, PCS's biggest client. *See id.* ¶ 26. To better assist IAD, PCS partnered with another Colombian entity, Ingeneria Telecomunicaciones, Sistemes y Redes Inteligentes S.A.S. ("InteRedes"), to help "develop and create custom software[.]" *Id.* ¶ 2. On May 1, 2020, PCS contracted with InteRedes "to develop a proprietary Customer Relationship Management software ('CRM') designed to collect and organize the personal identifying information of potential Spanish-speaking individuals in need of immigration services (the 'Contract')." *Ibid.*; *see also* Contract and the Plaintiffs' Translation ("Contract") [ECF No. 33-1].

The Contract includes three provisions that are relevant here. *First*, the Contract forbade InteRedes from "develop[ing] any other kind of CRM software with similar characteristics to the one licensed exclusively in favor of [PCS], and that can be marketed to other companies." Contract at 41. *Second*, the Contract set forth a strict confidentiality provision, by which each party "agree[d] not to use or disclose the confidential information of the other party or third parties, which comes to its knowledge by reason of or under this contract." *Id.* at 9. *Third*, the Contract contained an arbitration clause, which provided as follows:

> The conflicts that may arise during the execution of the contract, shall be resolved by an Arbitral Tribunal that will meet at the Center for Conciliation, Arbitration and Amicable Composition of the Chamber of Commerce of Neiva-Huila[.]

*Id.* at 10; *but cf.* Defendants' Translation of Contract [ECF No. 40-2] at 1 ("Any conflicts arising during the performance of the contract clauses shall be resolved by an Arbitral Tribunal convening at the Conciliation, Arbitration, and Friendly Settlement Center of the Chamber of Commerce of Neiva-Huila[.]").

On October 28, 2022, Defendant IPRO was incorporated in Florida. *See* Amended Complaint ¶ 31. IPRO "provides the same services as IAD, namely, the provision of legal advice to individuals needing help with immigration services." *Ibid.* At around the same time that IPRO was incorporated, "PCS found itself with fewer leads and less data to sell to IAD, resulting in a dramatic decrease in

2

revenue for both PCS and IAD." *Id.* ¶ 38. This is not a coincidence, the Plaintiffs say, because "a number of PCS employees [had] abruptly left PCS to join competitor organizations . . . [,] which provide client locating [services] identical to those provided by PCS," and these competitors began working with IPRO and others "to solicit business away from IAD and PCS." *Id.* ¶ 46. The Plaintiffs also suggest that IPRO acquired "Excel documents consisting of lists of potential clients, including current clients of IAD," which "contain[ed] personal identifiers of clients such as country of origin, email, date of birth, and phone numbers." *Id.* ¶ 54. A forensic analysis of this data led the Plaintiffs to believe "that it is both substantially similar in both structure and content to PCS' database, thereby containing the trade secrets of PCS and IAD." *Id.* ¶ 55.

How did IPRO acquire all this valuable information? According to the Plaintiffs, one of PCS's new competitors is "Leads Inside S.A.S.," a Colombian company owned by Edwin Marin—the majority shareholder of InteRedes. *See id.* ¶¶ 3, 39. "IPRO," the Plaintiffs insist, "could only have obtained the trade secrets of PCS and IAD from Marin . . . . [who] knew that he could generate substantial revenue for his new company if he stole the information from PCS." *Id.* ¶ 56. On March 23, 2023, PCS sent IPRO a demand letter, "insisting that IPRO cease and desist from using, distributing, or otherwise deriving economic benefit from PCS's CRM software and the client data contained in it" and requesting that IPRO "provide a full description of the means by which IPRO obtained the trade secrets belonging to PCS[.]" *Id.* ¶¶ 61–62. When IPRO "continue[d] to use the illicit copy of PCS's proprietary CRM software and the confidential information," the Plaintiffs filed this lawsuit. *Id.* ¶ 64.

The Plaintiffs' Amended Complaint asserts six counts against both Defendants: (1) injunctive relief, asking us to prohibit the Defendants from "continu[ing] [to] us[e] the misappropriated trade secrets of PCS and IAD" (Count I), *id.* ¶ 69; (2) misappropriation of trade secrets, in violation of 18 U.S.C. § 1836, *id.* ¶ 71; (3) misappropriation of trade secrets, in violation of FLA. STAT. § 688.001, *id.*

3

¶ 77; (4) tortious interference with a contract, *id.* ¶ 81; (5) tortious interference with business relations, *id.* ¶ 88; and (6) unjust enrichment, *id.* ¶ 96.

## THE LAW

In 1925, "Congress enacted the Federal Arbitration Act to overcome 'the judiciary's long-standing refusal' to enforce arbitration agreements and, in particular, to place such agreements 'upon the same footing as other contracts.' The Act thus aimed to 'make arbitration agreements as enforceable as other contracts, but not more so.'" *Calderon v. Sixt Rent a Car, LLC*, 5 F.4th 1204, 1215–16 (11th Cir. 2021) (Newsom, J., concurring) (first quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989) (cleaned up); and then quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967)).

"Section 2, the primary substantive provision of the Act, provides, in relevant part, as follows: 'A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quoting 9 U.S.C. § 2 (cleaned up)). The Supreme Court has "described this provision as reflecting both a 'liberal federal policy favoring arbitration,' and the 'fundamental principle that arbitration is a matter of contract.'" *Ibid.* (first quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983); and then quoting *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010)). "In line with these principles, courts must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms[.]" *Ibid.* (first citing *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006); and then citing *Volt Info. Scis.*, 489 U.S. at 468).

The Eleventh Circuit has "recognized that the FAA creates a 'presumption of arbitrability' such that 'any doubts concerning the scope of arbitrable issues should be resolved in favor of

arbitration.'" *Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1329 (11th Cir. 2016) (quoting *Dasher v. RBC Bank (USA)*, 745 F.3d 1111, 1115–16 (11th Cir. 2014)). So, "parties may agree to arbitrate gateway questions of arbitrability including the enforceability, scope, applicability, and interpretation of the arbitration agreement." *Jones v. Waffle House, Inc.*, 866 F.3d 1257, 1264 (11th Cir. 2017) (citing *Rent-A-Ctr.*, 561 U.S. at 68–69). At the same time, "'while doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration, the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made.'" *Bazemore*, 827 F.3d at 1329 (quoting *Dasher*, 745 F.3d at 1116).

As with any other contract, "a party will not be required to arbitrate where it has not agreed to do so." *Valiente v. StockX, Inc.*, 2022 WL 17551090, at *2 (S.D. Fla. Dec. 9, 2022) (Bloom, J.) (citing *Nat'l Auto Lenders, Inc. v. SysLOCATE, Inc.*, 686 F. Supp. 2d 1318, 1322 (S.D. Fla. 2010) (Cooke, J.), *aff'd*, 433 F. App'x 842 (11th Cir. 2011)). "It is axiomatic that the determination of whether the parties have agreed to submit a dispute to arbitration is an issue of law subject to judicial resolution." *Ibid.* (citing *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010)). "It is well settled in both commercial and labor cases that whether parties have agreed to submit a particular dispute to arbitration is typically an issue for judicial determination." *Ibid.* (cleaned up); *see also Cat Charter, LLC v. Schurtenberger*, 646 F.3d 836, 843 (11th Cir. 2011) ("As the [FAA] makes clear, arbitration is a creature of contract. *Parties must agree to arbitrate in the first instance*, and may contractually limit or alter the issues to be presented to the arbitrators, the scope of the award, and, as here, the form of the award." (emphasis added)). And, in deciding whether the parties agreed to arbitrate their claims, the Eleventh Circuit has adopted the view of "sister circuits that a summary judgment-like standard is appropriate and [held] that a district court may conclude as a matter of law that parties did or did not enter into an arbitration agreement only if 'there is no genuine dispute as to any material fact' concerning the formation of such an agreement." *Bazemore*, 827 F.3d at 1333 (quoting FED. R. CIV. P. 56(a)).

5

## ANALYSIS

In their Motion, the Defendants advance three arguments. *First*, they say that we should dismiss (rather than stay) this action and compel the Plaintiffs to arbitrate because "[t]his lawsuit is subject to a written arbitration agreement embedded in the Contract that creates a contractual duty for PCS to arbitrate its claims before an arbitration tribunal situated in Neiva, Colombia." Motion at 8. And, although the Defendants concede that they are "not signatories to the Contract[,]" they insist that they can compel arbitration under the FAA. *Ibid*. *Second*, the Defendants argue that the case should be dismissed under the doctrine of *forum non conveniens*. *See id.* at 13 ("The doctrine of forum non conveniens is designed to protect the U.S. Defendants from oppressive and vexatious litigation, which is out of proportion to the plaintiff's convenience (here, PCS)."). *Third*, the Defendants urge us to dismiss Counts I and II of the Amended Complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. *See id.* at 18–19 ("[Count I] should be dismissed because injunctive relief is a remedy, not a cause of action. . . . Plaintiffs' claim[ ] for misappropriating trade secrets under 18 U.S.C. § 1836 [Count II] fail[s] because Plaintiffs have failed to allege [they were acquired] by 'improper means.'"). And, since Count II is the only federal claim in the Amended Complaint, the Defendants also ask us to dismiss the remaining counts for lack of jurisdiction. *See id.* at 19 ("If the Court dismisses this [federal trade-secrets] claim with prejudice, it divests this Court of federal question jurisdiction."). Because we agree with the Defendants' arbitration arguments, we need not—and do not—address their alternative arguments for dismissal.

When ruling on a motion to compel arbitration, we must first decide whether "there is an arbitration agreement governing this dispute[.]" *Bazemore*, 827 F.3d at 1329. We rely on state law to determine "whether an enforceable contract or agreement to arbitrate exists." *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1368 (11th Cir. 2005) (citing *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987)). "Under both federal and Florida law, there are three factors for the court to consider in

6

determining a party's right to arbitrate: (1) a written agreement exists between the parties containing an arbitration clause; (2) an arbitrable issue exists; and (3) the right to arbitration has not been waived." *Sims v. Clarendon Nat'l Ins. Co.*, 336 F. Supp. 2d 1311, 1326 (S.D. Fla. 2004) (Altonaga, J.) (citing *Marine Env't Partners, Inc. v. Johnson*, 863 So. 2d 423, 426 (Fla. 4th DCA 2003)). If there is a valid arbitration clause, we must then decide whether non-signatories (like the Defendants) can enforce it. *See Tyman v. Ford Motor Co.*, 521 F. Supp. 3d 1222, 1227 (S.D. Fla. 2021) (Cooke, J.) ("[C]ourts recognize that, under a variety of circumstances, non-signatories may compel arbitration[.]" (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009)). "The issue of whether a non-signatory to an agreement can use an arbitration clause in that agreement to force a signatory to arbitrate a dispute between them is controlled by state law." *Kroma Makeup EU, LLC v. Boldface Licensing + Branding, Inc.*, 845 F.3d 1351, 1354 (11th Cir. 2017).

Although the Plaintiffs concede that the Contract "contains a valid arbitration clause," Response at 11, they insist that the Defendants *cannot* compel them to arbitrate for two reasons. *First*, they say that the Contract's arbitration clause is "narrowly drawn" and applies only "to conflicts arising *during the execution* of the [C]ontract." *Ibid.* (emphasis added). Put another way, the Plaintiffs believe that their claims aren't sufficiently related to the execution of the Contract to fall within the ambit of the arbitration clause. *See id.* at 12 ("[The] plaintiffs' claims do not arise during the execution of the Contract—[the Defendants] are alleged to have misappropriated the software *after it was created*." (emphasis added)). *Second*, the Plaintiffs contend that, even if the claims *were* related to the Contract's arbitration clause, the Defendants (as non-signatories) *cannot* compel arbitration. *See id.* at 11 ("But, 'a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit,' and for this reason 'a non-signatory to a contract containing an arbitration agreement ordinarily cannot compel a signatory to submit to arbitration.'" (cleaned up) (quoting *Koechli v. BIP Int'l, Inc.*, 870 So. 2d 940, 943 (Fla. 1st DCA 2004))). We disagree on both counts.

7

## I.     The Contract's Arbitration Clause Applies Here

To compel arbitration, as we've said, the Plaintiffs must show that "(1) a written agreement exists between the parties containing an arbitration clause; (2) an arbitrable issue exists; and (3) the right to arbitration has not been waived." *Sims*, 336 F. Supp. 2d at 1326. There's no dispute that a written agreement with an arbitration clause exists, and no one suggests that the right to arbitration has been waived. *See generally* Motion; Response; Reply.[2] So, if the scope of the Contract's arbitration clause encompasses the Amended Complaint's allegations, the clause will apply here.

The scope of an arbitration clause "falls within the category of 'gateway matters' which the Supreme Court has instructed us that courts and not arbitrators should decide[.]" *Anders v. Hometown Mortg. Servs., Inc.*, 346 F.3d 1024, 1027 (11th Cir. 2003) (quoting *Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 452 (2003)). As with any other contractual provision, we look to the plain language of the arbitration clause to determine its scope. *See Jackson v. Shakespeare Found., Inc.*, 108 So. 3d 587, 593 (Fla. 2013) ("The intent of the parties to a contract, as manifested in the plain language of the arbitration provision and contract itself, determines whether a dispute is subject to arbitration."). And, if there's any ambiguity in the language of the clause, we resolve that ambiguity in favor of arbitration. *See ibid.* ("Courts generally favor such provisions, and will try to resolve an ambiguity in an arbitration provision in favor of arbitration."); *see also Granite Rock Co.*, 561 U.S. at 298 ("The first principle is that where, as here, parties concede that they have agreed to arbitrate *some* matters pursuant to an

---

[2] By failing to discuss waiver in their pleadings, the Plaintiffs have forfeited any argument they might have made on that issue. *See United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court *sua sponte* [only] in extraordinary circumstances."); *Sappupo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority."); *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived.").

arbitration clause, the law's permissive policies in respect to arbitration counsel that any doubts concerning the scope of arbitral issues should be resolved in favor of arbitration." (cleaned up)).

The Plaintiffs contend that the Contract's arbitration clause cannot apply here because "all the claims against defendants, indeed all the allegations contained in the Amended Complaint . . . [,] fall outside the scope of the Contract's narrowly drawn arbitration clause, which applies only to conflicts arising during the execution of the contract." Response at 11 (citing Contract at 10); *see also id.* at 12 ("Simply put, plaintiffs' claims do not arise during the execution of the Contract—[the Defendants] are alleged to have misappropriated the software after it was created.").[3] But this crabbed reading of the text is inconsistent with the Clause's plain meaning. Worse, it contradicts the Plaintiffs' *own* allegations.

The phrase "during the execution of the contract" is understood to be broad—albeit "not as broad as a clause requiring arbitration of any dispute between [the parties] or claim by either [party] against the other." *Telecom Italia SpA v. Wholesale Telecom Corp.*, 248 F.3d 1109, 1114 (11th Cir. 2001) (cleaned up); *see also Armada Coal Export, Inc. v. Interbulk, Ltd.*, 726 F.2d 1566, 1568 (11th Cir. 1984) (describing the clause "[a]ny dispute arising during the execution of the [contract] shall be settled by

---

[3] Because the Contract was originally drafted in Spanish, the parties present competing translations of the arbitration clause. *Compare* Contract at 10 ("The conflicts *that may arise during the execution of the contract*, shall be resolved by an Arbitral Tribunal that will meet at the Center for Conciliation, Arbitration and Amicable Composition of the Chamber of Commerce of Neiva-Huila[.]" (emphasis added)), *with* Defendants' Translation of Contract at 1 ("Any conflicts *arising during the performance of the contract clauses* shall be resolved by an Arbitral Tribunal convening at the Conciliation, Arbitration, and Friendly Settlement Center of the Chamber of Commerce of Neiva-Huila[.]" (emphasis added)). The only relevant difference between the two translations, so far as we can tell, is that one version says that the Clause applies to any conflict "that may arise during the execution of the contract," while the other cabins the Clause to all conflicts "arising during the performance of the contract clauses[.]" *Ibid.* Needless to say, we don't think this minute (and frankly immaterial) syntactic difference alters the plain meaning of the Clause *at all*. But, if it did, "at the motion to dismiss stage, the Court is obliged to . . . resolve all factual conflicts in favor of the Plaintiff[s]," so we'll "accept the translation of the [Contract] presented by the Plaintiff[s]." *SC Pro Tv SA v. Glob. Connect Network, Inc.*, 2023 WL 5352902, at *3 (N.D. Ga. Aug. 21, 2023) (citing *Wildling v. DNC Servs. Corp.*, 941 F.3d 1116, 1122 (11th Cir. 2019)).

9

arbitration" as "broad"). The Eleventh Circuit has held that these kinds of arbitration clauses (*viz.*, clauses with language that's tied to the contract's *execution*) apply when "the tort or breach in question was an immediate, foreseeable result of the performance of contractual duties." *Telecom Italia*, 248 F.3d at 1116; *accord Hearn v. Comcast Cable Commc'ns, LLC*, 992 F.3d 1209, 1213 (11th Cir. 2021) ("'[T]here must be some direct relationship between the dispute and the performance of duties specified by the contract in order to find that the dispute arises out of, relates to, or is connected to the underlying agreement." (cleaned up)). Put another way, these types of arbitration clauses don't apply to claims that *could have* arisen if the contract never existed. *See, e.g.*, *Int'l Underwriters AG v. Triple I: Int'l Invs., Inc.*, 533 F.3d 1342, 1349 (11th Cir. 2008) ("But here . . . International could have breached its bond commitment and defrauded Triple I even if there had been no escrow agreement at all. Triple I's claims are not related—with at least some directness—to the performance of duties specified in the escrow agreement." (citing *Telecom Italia*, 248 F.3d at 1116)); *Gedimex, S.A. v. Nidera, Inc.*, 290 F. App'x 311, 313 (11th Cir. 2008) ("Similarly, although the contracts in this case are clearly related, Nidera and Gedimex could have entered into the empty bag contract and the breach Gedimex alleges could have occurred even if there were no rice purchase contracts.").

Here, by contrast, the Amended Complaint *explicitly* accuses the Defendants of tortiously interfering with the Contract. *See, e.g.*, Amended Complaint ¶¶ 84–85 ("Upon information and belief, Leads Inside and Marin provided the CRM software, or another software with the same characteristics, and the personal identifying information contained in it, to [the Defendants] for their own economic benefit. There was no justification for [the Defendants] to interfere with the contract between PCS and InteRedes."). The Plaintiffs also accuse the Defendants of misappropriating their trade secrets by using "PCS's proprietary CRM software and the personal identifying information contained in that software" for "their own economic benefit and for the purpose of soliciting business away from [the Plaintiffs]." *Id.* ¶¶ 73–74. And, of course, this "proprietary CRM software"—and the personal

10

identifying information within it—can only be considered a trade secret *because* the Contract identified this information as confidential. *See* Contract at 9 ("Each party agrees not to use or disclose the confidential information of the other party or third parties, which comes to its knowledge by reason of or under this contract. . . . [C]onfidential information of the parties shall be understood as all information that is not generally known, as well as information that has not been made public, access codes, sources codes, information provided for the feasibility study of this contract, information entered into the software, etc.").[4] The Plaintiffs' claims against the Defendants, in other words, *only* exist because the Defendants and other third parties purportedly violated the Contract's "strict confidentiality and distribution provisions." Reply at 9; *see also, e.g.*, *Mercury Telco Grp., Inc. v. Empresa de Telecommunicaciones de Bogota S.A. E.S.P.*, 670 F. Supp. 2d 1350, 1356 (S.D. Fla. 2009) (Zloch, J.) ("Plaintiff's tortious interference claims . . . clearly relate to the performance of the Agreement, as they are based upon Defendant's allegedly improper efforts to raise rates on the calling cards unilaterally in contravention of the Agreement."). Since there's "some direct relationship between the dispute and the performance of the duties specified by the [C]ontract," *Hearn*, 992 F.3d at 1213 (cleaned up), the Clause plainly applies to the parties' dispute.

## II. The Defendants Can Compel Arbitration

Having found that the Contract contains an enforceable Arbitration Clause, we must now decide whether the Defendants can use that Clause to compel the Plaintiffs to arbitrate, *even though* neither Defendant is a signatory to the Contract? The Defendants argue that they *can* compel arbitration in these circumstances under the doctrine of "equitable estoppel."[5] Equitable estoppel—

---

[4] *See also* 18 U.S.C. § 1839(3) (defining a "trade secret" as "all forms and types of financial, business, scientific, technical, economic, or engineering information" that the owner "has taken reasonable measure to keep . . . secret" and which "derives independent economic value" from being secret).
[5] One of the Plaintiffs, IAD, is "not a signatory to the Contract." Motion at 11. But the Defendants say that this doesn't matter because, "[u]nder the 'direct benefits' theory of estoppel, '[a] party is estopped from denying its obligation to arbitrate when it receives a "direct benefit" from a contract

which allows "a non-signatory defendant to enforce an arbitration clause against a signatory plaintiff," *Allscripts Healthcare Sols., Inc. v. Pain Clinic of Nw. Fla., Inc.*, 158 So. 3d 644, 646 (Fla. 3d DCA 2014)—applies when: (1) the signatory "is relying on the agreement to assert its claims against [the non-signatories]"; and (2) "the scope of the arbitration clause covers the dispute," *Kroma*, 845 F.3d at 1354. Since we've already found that the scope of the Contract's arbitration clause covers this lawsuit, we must now decide whether, in asserting their claims, the Plaintiffs have sufficiently relied on the Contract. We conclude that they have.

Florida law recognizes two scenarios in which equitable estoppel is appropriate: *one*, "when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the non[-]signatory," *Allscripts*, 158 So. 3d at 646 (quoting *Koechli*, 870 So. 2d at 944); and *two*, "when 'there are allegations of concerted action by both a non[-]signatory and one or more of the signatories to the contract,'" *ibid.* (quoting *Roman v. Atl. Coast Constr. & Dev., Inc.*, 44 So. 3d 222, 224 (Fla. 4th DCA 2010)). And the Eleventh Circuit has essentially adopted these same two exceptions. *See MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999) ("First, equitable estoppel applies when the signatory to a written agreement containing an

---

containing an arbitration clause.'" *Ibid.* (quoting *Kakawi Yachting, Inc. v. Marlow Marine Sales, Inc.*, 2014 WL 12650701, at *4 (M.D. Fla. Oct. 3, 2014) (McCoun, Mag. J.)). The Plaintiffs don't dispute that IAD can be compelled to arbitrate under the "direct benefits" theory, *see generally* Response, so they've waived the contrary position, *see Campbell*, 26 F.4th at 873 ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court *sua sponte* [only] in extraordinary circumstances."); *Sappupo*, 739 F.3d at 681 ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority."); *Hamilton*, 680 F.3d at 1319 ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d at 1163 ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived."). We note, though, that the Plaintiffs have *already admitted* that IAD "is a known and intended beneficiary of the contract." Amended Complaint ¶ 26. And "[a] non-party to a contract containing an arbitration clause" *can* be compelled to arbitrate if "the non-party is a third-party beneficiary to the contract." *Mims v. Glob. Credit & Collection Corp.*, 803 F. Supp. 2d 1349, 1354 (S.D. Fla. 2011) (Altonaga, J.) (citing *Peters v. The Keyes Co.*, 402 F. App'x 448, 451 (11th Cir. 2010)).

12

arbitration clause must rely on the terms of the written agreement in asserting its claims against the non[-]signatory. . . . Second, application of equitable estoppel is warranted when the signatory to the contract containing the arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the non[-]signatory and one or more of the signatories to the contract." (cleaned up)), *abrogated on other grounds by Carlisle*, 556 U.S. at 630–31; *see also Lavigne v. Herbalife, Ltd.*, 967 F.3d 1110, 1119 (11th Cir. 2020) (same). In our view, both exceptions apply here.

*First*, the Plaintiffs "rely on the terms of the written agreement in asserting [their] claims" against the Defendants. *Allscripts*, 158 So. 3d at 646. As we've explained, the gravamen of the Plaintiffs' claims is that the Defendants have misappropriated "a proprietary ['CRM'] software designed to collect and organize the personal identifying information of potential Spanish-speaking individuals in need of immigration services," which was developed by InteRedes for the exclusive benefit of the Plaintiffs. Amended Complaint ¶ 18; *see also ante*, at 11 ("The Plaintiffs' claims against the Defendants, in other words, *only* exist because the Defendants and other third parties purportedly violated the Contract's strict confidentiality and distribution provisions." (cleaned up)). It is, in sum, the Contract—and not some other written instrument or law—that prohibits InteRedes, Marin, and the Defendants from using this information for their own economic benefit. *See* Contract at 50 ("By means of this Agreement [InteRedes] undertakes to keep secret, to not disclose, and to comply with the obligations and prohibitions detailed below, in relation to the Confidential information that is disclosed by the Owner of the information necessary to develop the custom [CRM] software. . . . Once the [Contract] has been fulfilled, [InteRedes] may not make any use of the information and will maintain absolute confidentiality about it under the conditions and during the term established in this agreement."). And the Plaintiffs admit as much in the Amended Complaint. *See* Amended Complaint ¶¶ 23–24 ("The Contract contains a confidentiality provision prohibiting InteRedes from sharing the CRM software with third parties and from using or disclosing to third parties the confidential

13

information collected by the software. PCS expected that InteRedes would respect the confidentiality provision, which was designed to protect PCS's proprietary information, and expected that any third party would similarly respect PCS's exclusive right to the CRM software." (cleaned up)).

Trying to backtrack from its own admissions, the Plaintiffs cite a long litany of cases from our Circuit that (they say) illustrate how "[n]one of the counts in the Amended Complaint depend on the Contract[.]" Response at 13–14. But all these cases are different from ours precisely because they were based on claims that would have arisen between the parties—with or without a contract. *See, e.g.*, *Leidel v. Coinbase, Inc.*, 729 F. App'x 883, 890 (11th Cir. 2018) ("Here, Leidel *does not seek to enforce the terms or obligations of the User Agreements* entered into by Vernon and Cryptsy. Instead, Leidel seeks to enforce obligations allegedly imposed on Defendant *by federal statutes, federal regulations, and state common law*." (emphases added)); *Rolls-Royce PLC v. Royal Caribbean Cruises Ltd.*, 960 So. 2d 768, 771 (Fla. 3d DCA 2007) ("Resolution of the claims raised against Rolls–Royce *does not require reference to or construction of the shipbuilding agreements* between Royal Caribbean and CAT." (emphasis added)); *Ginsberg v. Vitamins Because LLC*, 2021 WL 7707264, at *6 (S.D. Fla. June 9, 2021) (Williams, J.) ("[T]he Court concludes that GMAX and Jolly Dollar cannot rely on equitable estoppel to enforce the GTA or Prime Agreement, because the claims against them *do not rely on the terms of these agreements*. . . . Instead, Plaintiffs' claims are solely based on Defendants' fraudulent mislabeling and defective manufacture of their SAMe products, *conduct that is wholly unrelated to the obligations set forth in these agreements*." (emphases added)); *It Works Mktg., Inc. v. Melaleuca, Inc.*, 2021 WL 1650266, at *5 (M.D. Fla. Apr. 27, 2021) (Mizelle, J.) ("*None* of It Works' four claims against Melaleuca rely on the Distributor Agreement because each claim arises from alleged breaches of duties *otherwise imposed by law*." (emphases added)).[6]

---

[6] The last case the Plaintiffs rely on, *Grupo Televisa, S.A. v. Telemundo Communications Group, Inc.*, 485 F.3d 1233 (11th Cir. 2007), has nothing to do with non-signatories trying to enforce an arbitration agreement and was instead focused on whether the district court properly found that "Televisa's

Here, by contrast, if the Contract between PCS and InteRedes was *never* executed, there wouldn't have been proprietary software for the Defendants to misappropriate and, accordingly, there would be no cause of action for the Plaintiffs to assert against the Defendants. Because the Plaintiffs cannot "seek[ ] to enforce certain provisions" of the Contract (*i.e.*, its confidentiality provisions) while simultaneously trying "to avoid [its] arbitration provision," *Morales v. Perez*, 952 So. 2d 605, 609 n.2 (Fla. 3d DCA 2007), we find that the first equitable-estoppel exception applies here.

*Second*, even if the Plaintiffs' claims weren't based on the terms of the Contract (which they are), equitable estoppel would *still* be appropriate because "there are allegations of concerted action by both a non[-]signatory and one or more of the signatories to the contract." *Roman*, 44 So. 3d at 224. Again, the Plaintiffs affirmatively and unambiguously allege that the Defendants "obtained the [Plaintiffs'] trade secrets . . . from Marin, who is both the majority shareholder of InteRedes and the owner of Leads Inside." Amended Complaint ¶ 56. InteRedes is not only a signatory to the Contract, but "Marin signed the Contract on behalf of InteRedes." *Id.* ¶ 19. The Plaintiffs' allegations thus couldn't be clearer: They believe that Marin, in his capacity as an InteRedes manager, "access[ed] the proprietary CRM software and the information contained in it" and then provided that information to the Defendants for their shared economic benefit. *Id.* ¶ 56; *see also id.* ¶ 84 ("Upon information and belief, Leads Inside and Marin provided the CRM software, or another software with the same characteristics, and the personal identifying information contained in it, to [the Defendants] for their own economic benefit."). And it's precisely this sort of concerted (or collusive) activity between signatories (InteRedes and Marin) and non-signatories (the Defendants) that justifies the application of equitable estoppel. *See Marcus v. Fla. Bagels, LLC*, 112 So. 3d 631, 634 (Fla. 4th DCA 2013) ("[E]quitable estoppel will apply since there exists 'a relationship among the parties of a nature that

---

tortious interference claim sounded in contract law" in the context of a choice-of-law balancing test. *Id.* at 1243.

15

justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement.'" (quoting *Sokol Holdings, Inc v. BMB Munai, Inc.*, 542 F.3d 354, 359 (2d Cir. 2008))); *Northrop & Johnson Yachts-Ships, Inc. v. Royal Van Lent Shipyard B.V.*, 2020 WL 5627263, at *5 (S.D. Fla. June 8, 2020) (Williams, J.) ("The second exception regarding the doctrine of equitable estoppel applies here as well because Plaintiff has alleged 'substantially interdependent and concerted misconduct by both the nonsignatory [Feadship] and one or more of the signatories to the contract [Royal].'" (quoting *MS Dealer*, 177 F.3d at 947)), *aff'd*, 855 F. App'x 468 (11th Cir. 2021).

The Plaintiffs' counterarguments on this point are unpersuasive. The Plaintiffs first try to claim that "[t]he Amended Complaint does not contain allegation [sic] of a concerted effort between defendants and InteRedes, the signatory to the Contract[.]" Response at 14–15. But the Amended Complaint asserts that Marin—who is "the majority shareholder of InteRedes"—*both* signed the Contract on behalf of InteRedes *and* used his position at InteRedes to "access the proprietary software" that's at the heart of our case. Amended Complaint ¶¶ 19, 56. We agree with the Defendants that "the Amended Complaint, especially paragraph 56, speaks for itself on this issue." Reply at 7.

Next, the Plaintiffs point to *In re Humana Inc. Managed Care Litigation*, 285 F.3d 971 (11th Cir. 2002), *rev'd on other grounds sub nom.*, *PacifCare Health Systems, Inc. v. Book*, 538 U.S. 401 (2003), for their view that InteRedes and the Defendants *didn't* "act[ ] in concert" just because the Defendants "bought [the Plaintiffs'] trade secrets[.]" Response at 15. It's true that "allegations of collusive behavior between the signatory and non[-]signatory parties" only support an application of equitable estoppel when "the claims against the non[-]signatory are intimately founded in and intertwined with the obligations imposed by the contract containing the arbitration clause." *In re Humana*, 285 F.3d at 975 (cleaned up & quoting *MS Dealer*, 177 F.3d at 948). But, as we've said, the Plaintiffs' claims *are* "intertwined" with their Contract with InteRedes—a contract whose very purpose was to facilitate the creation of the

CRM software. *See* Amended Complaint ¶ 3 ("Marin then began using the PCS's proprietary software to identify Spanish-speaking individuals needing immigration help, and then provide[d] that information to IAD competitors, including [the Defendants]. This was a knowing misappropriation of trade secrets that also violated InteRedes' contract with PCS.").

Finally, the Plaintiffs ask us not to stay or dismiss this case because it's "well within [our] discretion to order arbitration of some claims but refuse to stay litigation of non-arbitrable claims." Response at 15–16. We agree with this argument in part. As the Supreme Court held just a few months ago, "[w]hen a district court finds that a lawsuit involves an arbitrable dispute, *and a party requests a stay pending arbitration*, § 3 of the FAA compels the court to stay the proceeding." *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024) (emphasis added). We're thus compelled to respect the Plaintiffs' request to stay, rather than dismiss, these proceedings. We won't, however, return this case to our active docket because the Plaintiffs don't tell us which of their claims (if any) are non-arbitrable. *See Sappupo*, 739 F.3d at 681 ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority."); *Hamilton*, 680 F.3d at 1319 ("[T]he failure to make arguments and cite authorities in support of an issue waives it."). And, even if a claim were non-arbitrable, we'd still exercise our discretion to stay the entire case until the arbitration process has been completed. *See Klay v. All Defendants*, 389 F.3d 1191, 1204 (11th Cir. 2004) ("When confronted with litigants advancing both arbitrable and nonarbitrable claims, however, courts have discretion to stay nonarbitrable claims.").

As the Third DCA cogently explained, equitable estoppel exists so that "a signatory plaintiff [cannot] sue to essentially enforce its rights under a contract and, at the same time, evade an arbitration agreement in the contract, simply by naming as defendants parties who were not signatories to the contract." *Allscripts*, 158 So. 3d at 646; *see also Hill v. GE Power Sys., Inc.*, 282 F.3d 343, 349 (5th Cir. 2002) ("The lynchpin for equitable estoppel is equity and the point of applying it to compel arbitration

17

is to prevent a situation that would fly in the face of fairness." (cleaned up)). And equitable estoppel is appropriate here because the Plaintiffs are "rely[ing] on the terms of the [Contract] in asserting [their] claims against the [Defendants]," *and* there "are allegations of concerted action by [the Defendants] and one or more of the signatories to the contract." *Allscripts*, 158 So. 3d at 646 (cleaned up). Since equitable estoppel applies—and because the Contract has a valid, enforceable arbitration clause—we now grant the Defendants' motion to compel arbitration.

## CONCLUSION

After careful review, therefore, we hereby **ORDER and ADJUDGE** as follows:

1. The Defendants' Motion to Compel Arbitration [ECF No. 40] is **GRANTED**.

2. The parties are **COMPELLED** to submit this dispute to the "Arbitral Tribunal that will meet at the Center for Conciliation, Arbitration and Amicable Composition of the Chamber of Commerce of Neiva-Huila[, Colombia]." Contract at 10.

3. Every **ninety days** from the date of this Order, the parties shall file a joint status report on the progress of their arbitration proceedings.

4. Within **fifteen days** of the arbitration's conclusion, the parties shall file a joint notice describing the outcome of the arbitration.

5. This case shall remain **STAYED** and **CLOSED** pending the completion of arbitration. All deadlines are **TERMINATED**, and any other pending motions are **DENIED as moot**.

**DONE AND ORDERED** in the Southern District of Florida on September 5, 2024.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record